# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **HECTOR MARTINEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-11-830-F** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

United States District Judge Stephen P. Friot has referred this matter to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b). In his remaining claim, Plaintiff Hector Martinez, appearing pro se, asserts—pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680 ("FTCA")—that Defendant United States of America negligently failed to protect him from an assault by gang members while he was housed at the Federal Detention Center in Houston, Texas ("FDC Houston"). *See* Compl., Doc. No. 1-5; Order, Doc. No. 213; R. & R., Doc. No. 197.[1]

## RELEVANT PROCEDURAL HISTORY

Defendant moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss Plaintiff's negligent protection from assault claim, contending that the facts establish that the Court lacks subject-matter jurisdiction over the claim. *See* "Defendant's Jurisdiction

---

[1] The Court previously dismissed a claim asserted by Plaintiff under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and granted summary judgment in favor of Defendant on Plaintiff's claim that Defendant negligently provided him substandard medical care. *See* Order, Doc. No. 38; Order, Doc. No. 213; R. & R., Doc. No. 197.

Motion," Doc. No. 251. Specifically, Defendant argues that the acts at issue—i.e., the acts by government personnel that Plaintiff alleges constitute negligence—fall within the "discretionary function exception" to the FTCA, and, thus, the United States' limited waiver of sovereign immunity does not apply, thereby depriving the Court of subject-matter jurisdiction. *See id.*; 28 U.S.C. §§ 1346(b)(1), 2674, 2680(a); *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008); *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 535-39 (1988).

Plaintiff responded, presenting evidentiary material and a declaration made under penalty of perjury. *See* "Plaintiff's Jurisdiction Response," Doc. No. 275; Pl.'s Decl. to Def.'s Jurisd. Mot. & Def.'s Second Mot. Summ. J., Doc. No. 278 ("8/8/2014 Martinez Decl."). Defendant filed a reply brief. Def.'s Reply to Pl.'s Resp., Doc. No. 284. The Court then granted Plaintiff's request to file a supplemental response brief and accepted Plaintiff's brief, as well as Defendant's supplemental reply brief, for consideration. *See* Order, Doc. No. 291; "Pl.'s Suppl. Resp.," Doc. No. 288; "Def.'s Suppl. Reply," Doc. No. 295.

Upon review of the parties' relevant filings, the Court found that (1) Defendant's Jurisdiction Motion presents a factual, rather than facial, attack on jurisdiction; (2) to resolve the jurisdictional question, the Court is required to consider matters beyond the pleadings; and (3) the jurisdictional question is "'intertwined with the merits of the case.'" Order, Doc. No. 300 at 6-8 (quoting *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)) (citing 28 U.S.C. §§ 1346(b)(1), 2674, 2680(a); *Pringle v. United States*, 208 F.3d 1220, 1223 (10th Cir. 2000); *Holt*, 46 F.3d at 1002-03; *Wheeler v.*

*Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987)). In such circumstances, a Rule 12(b)(1) motion to dismiss must be converted to a Rule 56 motion for summary judgment, and therefore the Court ordered Defendant's Jurisdiction Motion so converted. *Id.* at 7-8, 16 (citing *Holt*, 46 F.3d at 1003; *Redmon ex rel. Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir. 1991); *Wheeler*, 825 F.2d at 259).

Further, after providing a preliminary recitation of facts, the Court noted that the parties' evidentiary submissions had insufficiently addressed issues important to the determination of Defendant's Jurisdiction Motion. *Id.* at 8-12. The Court identified specific areas to be addressed and permitted the parties to file further supplemental briefs, along with additional evidentiary materials in support. *Id.* at 12-16. Each party filed such a supplemental brief. "Def.'s 2nd Suppl. Br.," Doc. No. 304; "Pl.'s 2nd Suppl. Br.," Doc. No. 326.

Finally, after addressing discovery motions and ordering the production of certain additional documents by Defendant to Plaintiff, the Court provided Plaintiff with an additional opportunity to file, by August 21, 2015, a supplemental brief in response to Defendant's Jurisdiction Motion, specifically limited to the issue of whether the discretionary function exception applies. Order, Doc. No. 353. Plaintiff did not file a supplemental brief, and the matter is now ready for decision.

Defendant has also separately moved for summary judgment on the merits of the case under Federal Rule of Civil Procedure 56. *See* Def.'s Second Mot. Summ. J., Doc. No. 253. Because the undersigned finds below that the discretionary function exception applies, and, in turn, the Court lacks subject-matter jurisdiction over Plaintiff's only

remaining claim, the undersigned recommends denial of the separate summary judgment motion, along with other pending matters, as moot.

ANALYSIS

A. *Summary Judgment Standard*

As noted, because the question of subject-matter jurisdiction is intertwined with the merits of Plaintiff's claim, the undersigned considers that question under a summary judgment standard. *See Ortiz v. U.S. ex rel. Evans Army Cmty. Hosp.*, 786 F.3d 817, 820 (10th Cir. 2015). Although all evidence is viewed and reasonable inferences therefrom are drawn in Plaintiff's favor, Plaintiff bears the burden of establishing subject-matter jurisdiction and ultimately must present evidence sufficient to do so by a preponderance of the evidence. *See id.*; *Garcia*, 533 F.3d at 1175; *Southway v. Cent. Bank of Nigeria*, 328 F.3d 1267, 1274 (10th Cir. 2003). For Defendant to be entitled to judgment as a matter of law, the Court must determine that "there is no genuinely disputed issue of material fact concerning [the absence of subject-matter] jurisdiction." *See Ortiz*, 786 F.3d at 820.

Pursuant to Federal Rule of Civil Procedure 56(c), parties may establish the existence or nonexistence of a disputed material fact through:

- citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or
- demonstration "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)-(B). Thus, the Court examines whether, in light of the undisputed material facts established through the parties' submissions pursuant to Rule 56(c), and viewing all disputed facts in Plaintiff's favor, this Court's subject-matter jurisdiction has been established by Plaintiff.

B. *Subject-Matter Jurisdiction and the FTCA's Discretionary Function Exception*

Federal courts have limited subject-matter jurisdiction, authorized only by the Constitution and statute, with a "presum[ption] that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Through the FTCA, the United States has unequivocally waived its sovereign immunity from certain tort claims, thereby providing federal courts with constitutional authority to hear those claims. *See* U.S. Const. art. III, § 2; 28 U.S.C. §§ 1346(b)(1), 2674-75, 2680; *see also* 28 U.S.C. § 2402. The FTCA's sovereign immunity waiver excludes certain, enumerated subjects, including acts within a federal employee's discretionary function. 28 U.S.C. § 2680. When such an exception applies, sovereign immunity has not been waived and a federal court is precluded, due to a lack of both constitutional and statutory authority, from exercising subject-matter jurisdiction over a claim premised upon such an excepted subject. *See id.*

The discretionary function exception preserves the United States' sovereign immunity from suit as to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The exception is intended to prevent judicial interference,

through tort actions, with the "social, economic, and political policy" decisions of the legislative and executive branches. *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984).

The exception only applies when two elements are present. *Garcia*, 533 F.3d at 1176 (applying two-part test set forth in *Berkovitz*, 486 U.S. at 536-37). First, the government employee's challenged conduct must have "involve[d] an element of judgment or choice." *Berkovitz*, 486 U.S. at 536; *see also Kiehn v. United States*, 984 F.2d 1100, 1102 (10th Cir. 1993). If the government employee had no discretion in his or her action, such as "when a federal statute, regulation, or policy specifically prescribes a course of action for [the] employee to follow"—leaving the employee "no rightful option but to adhere to the directive"—the first element is not satisfied. *Berkovitz*, 486 U.S. at 536; *see also United States v. Gaubert*, 499 U.S. 315, 322, 324 (1991) (noting that first element is not satisfied when government employee has "failed to follow the specific directions contained in the applicable regulations").[2] Second, the employee's exercise of that judgment or choice must have required public policy considerations. *Garcia*, 533 F.3d at 1176 (citing *Berkovitz*, 486 U.S. at 536-37).

---

[2] However, "[i]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324.

*C. Whether Plaintiff Has Established the Court's Subject-Matter Jurisdiction over His Claim*

1. Factual Background

Based upon the evidentiary materials submitted, the following material facts are either undisputed or assumed in Plaintiff's favor, as the nonmoving party.

Plaintiff was in the Federal Bureau of Prisons' ("BOP") custody serving a federal sentence from April 2004 through February 2007. *See* Monitored File, Doc. No. 299, RFP No 25 (SENTRY)-35.[3] Beginning on April 16, 2009, Plaintiff was again placed in the BOP's custody to serve a federal sentence. *See* 7/2/2013 Martinez Aff., Doc. No. 160-1, ¶ 2; Monitored File, RFP No 25 (SENTRY)-35.

That morning, Plaintiff arrived at FDC Houston to be temporarily housed as a "holdover inmate" while awaiting transfer to his assigned facility for long-term confinement in El Reno, Oklahoma. *See* Def.'s Jurisd. Mot. Ex. 1 ("Stewart Decl."), Doc. No. 251-1, ¶¶ 6-7; Monitored File, RFP No 25 (SENTRY)-22, -35. Upon his arrival

---

[3] During discovery in this matter, Defendant invoked the law enforcement privilege as to certain documents and presented those documents, ex parte, for in camera review. Order, Doc. No. 263, at 1-3. The Court found the privilege to be inapplicable to certain documents and portions of documents and ordered Defendant to produce to Plaintiff complete, redacted, or summarized versions, depending on the document. *Id.* at 1-8. At that time, Plaintiff was incarcerated at a federal facility. *See id.* at 3-4. Based upon security concerns, Defendant was required to produce the documents to Plaintiff through a "Monitored File," which Plaintiff was permitted to review, and cite by reference, but was not permitted to retain in his possession. *See id.* After documents from the Monitored File were cited in filings in this case, the Court ordered that a copy of the Monitored File be filed, under seal, so that the record would be complete for any reviewing court. Order, Doc. No. 298. Citations to the Monitored File in this Report and Recommendation reflect the document identifiers and page numbers provided by Defendant in creating the file.

in the sally port at FDC Houston, Plaintiff was interviewed by an SIS Officer, a type of security officer, from the facility's Gang Intelligence Unit. *See* Pl.'s 2nd Suppl. Br. Ex. BB ("Martinez SIS Interview Decl."), Doc. No. 326-4, ¶¶ 2-6, 10-13; 7/2/2013 Martinez Aff. ¶ 3; Fauver Decl., Doc. No. 304-1, ¶ 10; *see also* Pl.'s Jurisd. Resp., Doc. No. 275, at 2. Plaintiff states that he told the SIS Officer that the BOP believed Plaintiff to be affiliated with the "Texas Syndicate" gang and that the SIS Officer told Plaintiff that BOP records showed Plaintiff as a Texas Syndicate affiliate. *See* 8/8/2014 Martinez Decl. ¶ 14; Martinez SIS Interview Decl. ¶¶ 5-6.

That afternoon, BOP Correctional Counselor Charlene Stewart conducted an intake screening of Plaintiff, which included a "social interview" and completion of an intake screening form. Stewart Decl. ¶¶ 5-6; Stewart Decl. Ex. 1, Doc. No. 251-1, at 12 (4/16/2009 intake screening form); Monitored File, RFP No 25 (SENTRY)-22 (same). On the intake screening form, Ms. Stewart recorded, among other things, that Plaintiff stated (1) he knew of no reason that he should not be placed in the general population; (2) he was not a member or associate of any gang; and (3) he was a "CIM case," i.e., an inmate who has been assigned a Central Inmate Monitoring or "CIM" classification to designate that he requires special management. Stewart Decl. ¶¶ 14, 17, 20; Monitored File, RFP No 25 (SENTRY)-22. *See generally* 28 C.F.R. §§ 524.70-.76. Ms. Stewart reviewed information about Plaintiff on the BOP's SENTRY Inmate Management System ("SENTRY") and recorded on the intake screening form that Plaintiff had "numerous sep's," i.e., that he had been assigned multiple CIM "separations" requiring that he be kept apart from specific persons. Stewart Decl. ¶¶ 21, 20; Stewart Decl. Ex. 1;

*see also* 28 C.F.R. § 524.72(f). This portion of the intake screening form was signed by both Ms. Stewart and Plaintiff. Stewart Decl. Ex. 1.[4]

SENTRY records reflect that on April 16, 2009, Plaintiff had CIM separations from 25 specified individuals: (1) 23 designated by the BOP as "Paisa" gang affiliates (i.e., members, associates, or suspects of that gang), all of whom had been involved in a 2006 assault in which Plaintiff was found to have participated; (2) one designated as a Texas Syndicate affiliate; and (3) one who was the victim of an assault by inmates designated by the BOP as Texas Syndicate affiliates, including Plaintiff, but whose own affiliation, if any, was not specified. *See* Monitored File, RFP No 7; Monitored File, RFP No 25 (SENTRY)-27 to -30; Monitored File, SUMMARY-2; Def.'s Supplemental Jurisd. Reply Ex. 1 ("Gibson Decl."), Doc. No. 295-1, ¶¶ 5-10. Ms. Stewart reviewed the CIM separations for Plaintiff and determined that no person listed was located at FDC Houston. Stewart Decl. ¶ 26. Defendant's records confirm this fact. *See* Monitored File, SUMMARY-3.

Plaintiff asserts, and Defendant does not specifically dispute, that during his intake interview, Plaintiff informed Ms. Stewart that he had previously been assaulted by members of the Paisa and "Sureños" gangs. *See* 7/2/2013 Martinez Aff. ¶ 5; 8/8/2014 Martinez Decl. ¶ 7. Plaintiff also asserts that he told Ms. Stewart that he was not a gang

---

[4] As noted on the intake screening form's "Staff Checklist," Ms. Stewart did not review Plaintiff's Presentence Investigation Report or Central File, stating that those documents were likely unavailable to her. *See* Stewart Decl. ¶¶ 8-10; Monitored File, RFP No 25 (SENTRY)-22. Those documents are typically forwarded to an inmate's final destination and, thus, unavailable for holdover inmates. *See* Stewart Decl. ¶ 8.

member but had been designated by the BOP as a Texas Syndicate affiliate. *See* 8/8/2014 Martinez Decl., Doc. No. 278, ¶¶ 8, 10, 12, 16; *see also* 7/2/2013 Martinez Aff. ¶ 12 (implying other inmates may have believed Plaintiff to be a Texas Syndicate affiliate). SENTRY records reflect that in February 2006, Plaintiff was designated by the BOP as a Texas Syndicate suspect. Monitored File, STG-1.[5]

Ms. Stewart approved Plaintiff's placement in a general population unit, Unit 5 East. Stewart Decl. ¶ 26, Stewart Decl. Ex. 1; 7/2/2013 Martinez Aff. ¶ 6; Pl.'s 2nd Suppl. Br. Ex. C1, Doc. No. 326-6 ("12/29/2014 Martinez Decl."), ¶ 9.[6] That evening, Plaintiff was physically assaulted by multiple inmates in Unit 5 East, causing injuries to Plaintiff's head. Def.'s Jurisd. Mot., Doc. No. 251, at 8; 9/30/2013 Martinez Decl., Doc.

---

[5] The parties dispute whether Ms. Stewart knew or should have known about Plaintiff's Texas Syndicate gang affiliation from her review of SENTRY records during Plaintiff's intake screening. An April 30, 2014 version of Plaintiff's intake screening form, a SENTRY-generated document, contains a remark of "TS ASSOC" on page two. Monitored File, RFP No 25 (SENTRY)-10. Defendant has not produced page two of the April 16, 2009 version of Plaintiff's intake screening form and has indicated that the page is unavailable because only page one of the form, where intake interview results are recorded, is typically retained. *See* Def.'s Mot. Ex. 1, Crook Suppl. Decl., Doc. No. 350-1, ¶¶ 4-7; *see also* Fed. Bureau of Prisons, Program Statement No. P5290.15, Intake Screening (eff. Mar. 30, 2009) (supplementing 28 C.F.R. §§ 522.20-.21), http://www.bop.gov/policy/progstat/5290_015.pdf; Monitored File, RFP No 25 (SENTRY)-9. Ultimately, whether Ms. Stewart saw or should have seen any remark designating Plaintiff as a Texas Syndicate gang affiliate during her SENTRY records review is immaterial in addressing Plaintiff's assertion of subject-matter jurisdiction. Even assuming in Plaintiff's favor that Ms. Stewart did see such information, Plaintiff does not establish, as discussed below, that the information would have required Ms. Stewart to follow a prescribed course of action under a federal statute, regulation, or policy.

[6] This declaration by Plaintiff is undated. Its date of filing has been used to distinguish it from other declarations cited.

No. 163, ¶¶ 4-5, 7; Monitored File, RFP No 5-18 to 19, 50 to 51. Plaintiff asserts, and Defendant does not specifically dispute, that the assaulting inmates were members of the Paisa and Sureños gangs. *See* 7/2/2013 Martinez Aff. ¶¶ 7-8.

Basic terms relevant to the analysis below are "Security Threat Group" and "Disruptive Group." The BOP uses the term "Security Threat Group" as "a general term that describes groups, gangs, or inmate organizations that have been observed acting together to promote violence, escape, drug activity, or terrorist activity." Gibson Decl. ¶ 5. The BOP defines "Disruptive Group" as "a subgroup of the general STG category" that includes "STGs that the BOP has formally certified as posing a threat to security that cannot be managed by routine measures." Gibson Decl. ¶ 6.

## 2. *Berkovitz* Analysis: Prong One

Plaintiff concedes that a Correctional Counselor such as Ms. Stewart may exercise discretion when making a housing assignment but contends that such discretion is precluded in certain circumstances based upon specific directives in federal statutes and regulations, BOP policies, and prison local policies. *See* Pl.'s Jurisd. Resp. at 4-5, 8, 9. Plaintiff contends that Ms. Stewart's discretion was so eliminated because she was required to, but did not, follow specific instructions for Plaintiff's housing assignment upon intake at FDC Houston.

More precisely, Plaintiff challenges Ms. Stewart's decision to place Plaintiff in the general population of Unit 5 East at FDC Houston, which contained Paisa and Sureños gang affiliates. Plaintiff asserts that 28 U.S.C. § 4042, 28 C.F.R. §§ 522.21, 524.70, and 524.72, BOP policies, and FDC Houston's local policies required Ms. Stewart (1) to

assign Plaintiff to a housing unit that contained no Paisa or Sureños gang affiliates; and (2) because BOP records designated Plaintiff as a Texas Syndicate gang affiliate, to assign Plaintiff to a specific general population unit (Unit 6 West) in which Texas Syndicate gang affiliates were allegedly exclusively assigned at FDC Houston, separating them from Paisa and Sureños gang affiliates. *See* Pl.'s Jurisd. Resp. at 3-7, 8, 9, 10; Pl.'s Suppl. Resp. at 1-2; Pl.'s 2nd Suppl. Br. at 2, 4, 5; *see also* Pl.'s Disc. Decl., Doc. No. 301, at 2.[7] The cited statute, regulations, and policies are discussed in turn.

    a. 18 U.S.C. § 4042

Under 18 U.S.C. § 4042, the BOP "shall . . . provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2); *see also id.* § 4042(a)(3) (stating BOP "shall . . . provide for the protection . . . of all persons charged with or convicted of offenses against the United States"). Plaintiff emphasizes the use of "mandatory language," i.e. "shall," in § 4042. Pl.'s Jurisd. Resp. at 4; Pl.'s Juris. Resp. Ex. D, Doc. No. 275-4. Plaintiff largely concedes, however, that § 4042 provides no specific instruction for a government employee to follow, suggesting instead that specific instructions for fulfilling the duties

_____

[7] Although Plaintiff describes his interview with an SIS Officer at FDC Houston upon his April 16, 2009 arrival, and asserts that he had a similar conversation with the SIS Officer as the one he later had with Ms. Stewart, Plaintiff does not clearly challenge any aspect of the SIS Officer's conduct vis-à-vis Plaintiff's housing assignment at FDC Houston. That is, Plaintiff does not allege that the SIS Officer was involved in Plaintiff's housing assignment or identify any applicable statute, regulation, or policy that would have directed the SIS Officer to follow a prescribed course of action in relation to Plaintiff's housing assignment.

of care imposed upon the BOP in § 4042 are contained within federal regulations and BOP Policy and Program Statements. *See* Pl.'s Jurisd. Resp. at 5.

Courts have consistently concluded that, despite the use of "shall," § 4042 involves an element of judgment or choice, rather than prescribing a course of action for a government employee to follow. *See, e.g.*, *Cohen v. United States*, 151 F.3d 1338, 1342-43 (11th Cir. 1998) ("[E]ven if § 4042 imposes on the BOP a general duty of care to safeguard prisoners, the BOP retains sufficient discretion in the means it may use to fulfill that duty to trigger the discretionary function exception."); *Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) ("While it is true that this statute sets forth a mandatory duty of care, it does not . . . direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."). Plaintiff has not established that § 4042 deprived Ms. Stewart of discretion in making Plaintiff's housing assignment.

b. Federal Regulations

Plaintiff cites two federal regulations that he contends provide relevant, specific instructions for a government employee to follow when determining whether an inmate is suitable for placement in the general population: 28 C.F.R. §§ 524.70 and 524.72—both of which address the classification of inmates in the CIM System. *See* Pl.'s Jurisd. Resp. at 3-4, 9, 10; *see also* Pl.'s Suppl. Resp. at 1-2 (citing "CIM policy 524.72"); Pl.'s 2nd Suppl. Br. at 2 (citing "CIM Policy"). Plaintiff also references 28 C.F.R. § 522.21, which provides intake screening procedures. *See* Pl.'s Jurisd. Resp. at 3, 4, 5. Plaintiff asserts

that "mandatory language" in these regulatory provisions deprived Ms. Stewart of discretion in her housing assignment decision. *See* Pl.'s Jurisd. Resp. at 3-4, 9.

i. 28 C.F.R. §§ 524.70, 524.72

In 28 C.F.R. § 524.70, only general information regarding the purpose and scope of the CIM System is provided:

> The Bureau of Prisons monitors and controls the transfer, temporary release (e.g., on writ), and community activities of certain inmates who present special needs for management. Such inmates, known as central inmate monitoring (CIM) cases, require a higher level of review which may include Central Office and/or Regional Office clearance for transfers, temporary releases, or community activities. This monitoring is not to preclude a CIM case from such activities, when the inmate is otherwise eligible, but rather is to provide protection to all concerned and to contribute to the safe and orderly operation of federal institutions.

28 C.F.R. § 524.70. Plaintiff asserts that § 524.70 "is 'NOT' discretionary but is a duty," but he identifies no specific language within the regulation as providing a specific instruction to a government employee. Pl.'s Jurisd. Resp. at 3 (emphasis omitted).[8]

---

[8] Plaintiff also asserts, "In the CIM Program objective 524.70 at 2(a), and (d) states that institution will be safer by case management decisions, based on accurate information, such as PSI, Central File, or separations." Pl.'s Jurisd. Resp. at 10 (citing "CIM Policy 524.70 at 2(a) & (d)"). The information noted by Plaintiff does not appear in 28 C.F.R. § 524.70, which is quoted above in its entirety. Plaintiff appears to be referring to the BOP's Program Statement No. 5180.05, which supplements 28 C.F.R. §§ 524.70-.76. *See* Fed. Bureau of Prisons, Program Statement No. 5180.05, Central Intake Monitoring System 1 (eff. Dec. 31, 2007), http://www.bop.gov/policy/progstat/5180_005.pdf. However, Plaintiff does not explain how the cited provisions of the Program Statement provide specific rules or deprive a government employee of discretion. *See* Pl.'s Jurisd. Resp. at 10.

In 28 C.F.R. § 524.72, descriptions of CIM assignment categories are provided. Within this provision, Plaintiff focuses on descriptions in paragraphs (d) ("Disruptive group") and (f) ("Separation"). Pl.'s Jurisd. Resp. at 4, 5, 7, 9. Paragraph (d) states:

> Disruptive group. Inmates who belong to or are closely affiliated with groups (e.g., prison gangs), which have a history of disrupting operations and security in either state or federal penal (which includes correctional and detention facilities) institutions. This assignment also includes those persons who may require separation from a specific disruptive group.

28 C.F.R. § 524.72(d). Paragraph (f), in relevant part, states: "Separation. Inmates who may not be confined in the same institution (unless the institution has the ability to prevent any physical contact between the separatees) with other specified individuals who are presently housed in federal custody or who may come into federal custody in the future." 28 C.F.R. § 524.72(f).

The only specific directives regarding housing assignments that may be derived from the above provisions are that: (1) an inmate with a "separation" CIM assignment must be kept physically separate from a specified individual (*see* 28 C.F.R. § 524.72(f)); and (2) certain inmates with a "disruptive group" CIM assignment must be kept physically separate *from* a specified disruptive group (*see* 28 C.F.R. § 524.72(d)).[9] Plaintiff has not shown, however, that these specific directives precluded Ms. Stewart from assigning Plaintiff to Unit 5 East—the challenged conduct underlying Plaintiff's legal claim.

---

[9] Plaintiff asserts that § 524.72(f) permits separations from entire groups that have not been designated as disruptive groups. *See* Pl.'s 2nd Suppl. Br. at 4. However, the text of that provision, quoted above, does not reasonably support Plaintiff's assertion.

As indicated above, there is no dispute that Ms. Stewart reviewed the CIM separations for Plaintiff and determined that no person listed was located at FDC Houston. *See* Stewart Decl. ¶ 26; Monitored File, SUMMARY-3. Because Plaintiff's CIM separation assignments did not require separation from any specific individual located at FDC Houston, the restriction in 28 C.F.R. § 524.72(f) did not preclude Plaintiff's assignment to Unit 5 East.

Further, with respect to the restriction in 28 C.F.R. § 524.72(d), Plaintiff's evidentiary material does not establish a genuine question of fact as to whether, as of April 16, 2009, Plaintiff had a "disruptive group" CIM assignment that would require him to be separated from all affiliates of a disruptive group. In a declaration, Plaintiff asserts that he "signed a separation from Paisa and Sureno gangs" "on or about 2004/2005." 12/29/2014 Martinez Decl. ¶ 19 (capitalization altered). However, FDC Houston's Supervisory Correctional Officer, Captain Scott Fauver, states that neither the Paisa gang nor the Sureños gang had been designated by the BOP as a disruptive group as of April 16, 2009. *See* Fauver Decl. ¶¶ 13 (listing gangs recognized by BOP as disruptive groups), 25-26. This point is critical because absent the designation of the Paisa gang or Sureños gang as a disruptive group, § 524.72(d) could not be applied to require Plaintiff's separation from all the affiliates of either gang. *See* 28 C.F.R. § 524.72(d). Plaintiff cites no evidence indicating that the Paisa gang or the Sureños gang was designated as a disruptive group on or before April 16, 2009. Moreover, beyond his own statement, Plaintiff cites no evidence that he was to be kept separate from *all* Paisa gang affiliates (rather than just the 23 individual Paisa gang affiliates listed in his CIM separation

assignment *in 2006*).   Similarly, beyond his own statement, Plaintiff provides no evidence reflecting that he was to be kept separate from *any* Sureños gang affiliates.

Of note, the parties' argument on this point highlights a possible discrepancy in Defendant's submitted evidence regarding Plaintiff's affiliation with the Texas Syndicate gang as of April 16, 2009.  The undersigned addresses the issue below, finding that, to the extent a discrepancy persists, it is immaterial to the application of 28 C.F.R. § 524.72(d) and immaterial to the determination of Plaintiff's jurisdictional arguments.

It is undisputed that BOP records reflected, on April 16, 2009, that Plaintiff had a BOP Security Threat Group assignment based upon his suspected affiliation with the Texas Syndicate gang.  *See* Monitored File, STG-1; Monitored File, SUMMARY-1; Gibson Decl. ¶ 15.  The parties appear to dispute, however, whether Plaintiff also had a Disruptive Group assignment on that date, and both parties have used relevant terminology imprecisely and inconsistently.  In a document produced to Plaintiff by Defendant as a summary of privileged documents, Defendant states that, among the inmates listed on Plaintiff's unit roster at FDC Houston on April 16, 2009, "[o]nly the Plaintiff had a Disruptive Group (DG) assignment."  Monitored File, SUMMARY-1; *see* Order, Doc. No. 263, at 5-6.  Defendant later presented a declaration by BOP Intelligence Research Specialist Charles Gibson that Plaintiff "has not been assigned a 'Disruptive Group' CIM category."  Gibson Decl. ¶ 19.

The Court drew this seeming contradiction to Defendant's attention.  Order, Doc. No. 300, at 11 n.7.  In response, Defendant provided a declaration by Captain Fauver, who states: "References to a 'Disruptive Group Assignment' or 'DG Assignment' in

relation to Plaintiff reflect that the Texas Syndicate, the gang he is associated with, has been certified by the BOP's Chief of Intelligence as a Disruptive Group. However, Plaintiff is not a 'DG Member.'" Fauver Decl. ¶ 15. Captain Fauver describes a special certification and validation process for DG Members, as well as special security considerations, including, "ordinarily," a "long-term assignment to a High Security facility." *Id.* ¶¶ 15, 19; *see also* Fed. Bureau of Prisons, Program Statement No. P5100.08, Inmate Security Designation and Custody Classification 48 (eff. Sept. 12, 2006), http://www.bop.gov/policy/progstat/5100_008.pdf. Captain Fauver then notes that when Plaintiff was at FDC Houston on April 16, 2009, he was awaiting transfer to a medium security facility, further suggesting that Plaintiff was not a Disruptive Group member. *See* Fauver Decl. ¶ 19. The CIM assignment classification form supports the existence of a process and distinct requirements for an inmate receiving a CIM assignment as a disruptive group member.[10] *See* Monitored File, RFP No 7-1 to -3 (providing CIM assignment options, including "disruptive group"); *see also* Gibson Decl. ¶¶ 6-14.

Construed collectively, and drawing all reasonable inferences in Plaintiff's favor, Defendant's statements and the BOP's records reflect that, as of April 16, 2009, Plaintiff was designated as an affiliate of the Disruptive Group the Texas Syndicate gang, his affiliate status was as a suspect but not a member of that Disruptive Group, and in any

---

[10] As noted previously, there is also the possibility of a CIM assignment requiring the separation of an inmate from a disruptive group, which is also reflected in the CIM assignment classification form. It is only as to this type of CIM assignment that § 524.72(d) prescribes a course of action.

event he had not received a CIM assignment requiring his separation from a disruptive group. *See* Fauver Decl. ¶¶ 13, 15; Gibson Decl. ¶¶ 13-14; Monitored File, STG-1; Monitored File, RFP No 7-1 to -3; Monitored File, SUMMARY-1 to -2; *see also* 28 U.S.C. § 524.72(d). Even if Plaintiff were assumed to have been a member of the Disruptive Group the Texas Syndicate gang, that alone would not result in any separation requirement under 28 C.F.R. § 524.72(d) because that provision only concerns CIM assignments requiring an individual to be separated *from* all affiliates of a disruptive group. Neither the general summary judgment record, nor the possible discrepancy in Defendant's evidence as detailed above, creates a genuine dispute of fact as to whether Plaintiff, as of April 16, 2009, had a "disruptive group" CIM assignment that would require him to be separated from all affiliates of a disruptive group.

In sum, Plaintiff relies on his own assertion that he was to be separated from the Paisa and Sureños gangs in their entireties, but that assertion is contrary to certain documents as discussed above[11] and not supported by documents that reasonably would be expected to indicate the assertion's truth. The evidentiary material before the Court does not reflect a genuine question of material fact as to whether the restriction in 28 C.F.R. § 524.72(d) precluded Plaintiff's assignment to Unit 5 East. *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which

---

[11] For instance, Plaintiff's assertion that he "signed a separation from Paisa and Sureno gangs" "on or about 2004/2005," 12/29/2014 Martinez Decl. ¶ 19, is contrary to the later (2006) CIM separation assignment from only 23 individual Paisa gang affiliates, *see* Monitored File, RFP No 7. There would have been no reason to separate Plaintiff from some Paisa gang affiliates if he had already been separated from all Paisa gang affiliates.

is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

For the reasons set forth above, Plaintiff has not shown that 28 C.F.R. § 524.70 or the specific instructions derived from paragraphs (d) and (f) of 28 C.F.R. § 524.72 deprived Ms. Stewart of discretion in making Plaintiff's housing assignment.

ii. 28 C.F.R. § 522.21

In 28 C.F.R. § 522.21, BOP intake screening procedures are specified. As relevant here, the regulation states: "Immediately upon an inmate's arrival, staff shall interview the inmate to determine if there are non-medical reasons for housing the inmate away from the general population." 28 C.F.R. § 522.21(a)(1). Further, "the Warden shall ensure that a newly arrived inmate is . . . provided a social interview by staff before assignment to the general population." *See id.* § 522.21(a). Finally, "[s]taff shall place recorded results of . . . the social interview in the inmate's central file." *Id.* § 522.21(a)(3).

It is undisputed that two interviews were conducted before Plaintiff's assignment to the general population at FDC Houston on April 16, 2009. First, Plaintiff was interviewed by an SIS Officer in the sally port upon Plaintiff's arrival. *See* Martinez SIS Interview Decl. ¶¶ 2-6, 10-13; 7/2/2013 Martinez Aff. ¶ 3; Fauver Decl., Doc. No. 304-1, ¶ 10; Pl.'s Jurisd. Resp. at 2. Then, Ms. Stewart conducted a social interview with Plaintiff, recording the results on page one of an intake screening form that was later placed in Plaintiff's central file. *See* Stewart Decl. ¶¶ 5-6; Monitored File, RFP No 25

(SENTRY)-22. Plaintiff identifies no specific instruction in this regulation that dictated a particular housing assignment for Plaintiff at FDC Houston.

In a factually similar FTCA case, a federal district court found:

> While the BOP regulations require prison officials to interview an inmate immediately upon his arrival, "to determine if there are non-medical reasons for housing the inmate away from the general population," 28 C.F.R. § 522.21, the regulations do not mandate a non-discretionary course of conduct, but instead leave prison officials ample room for judgment.

*See Brown v. United States*, 569 F. Supp. 2d 596, 600 (W.D. Va. 2008). Plaintiff presents no persuasive reason to disagree with that court's finding and has not shown that § 522.21 deprived Ms. Stewart of discretion in making Plaintiff's housing assignment.

### c. BOP Policy

Plaintiff mentions an "intake screening program statement," referencing the BOP's Program Statement No. P5290.15, which provides guidance regarding 28 C.F.R. § 522.21 and additional instructions to government employees who participate in the intake process, including the social interview. *See* Pl.'s Jurisd. Resp. at 3, 4, 5, 8, 9, 10; Fed. Bureau of Prisons, Program Statement No. P5290.15, Intake Screening (eff. Mar. 30, 2009), http://www.bop.gov/policy/progstat/5290_015.pdf. Plaintiff asserts that the "intake screening interviewer 'Shall' ensure that separatees are not housed together, staff 'shall' review inmates['] sentry and thoroughly review the CIM clearance and separatees data to identify gang affiliations or separatees." Pl.'s Jurisd. Resp. at 4. However, neither § 522.21 nor the Program Statement mentions "gang" or "affiliation"; the Program Statement focuses instead on ensuring the proper separation of specific individuals:

> Staff shall place particular emphasis on the Central Inmate Monitoring status of the holdover, since, ordinarily, an inmate may not be transported with or confined with inmates from whom he or she is to be separated.
>
> To ensure that separatees are not housed together, staff shall access the newly received inmate's SENTRY-generated Intake Screening form and thoroughly review the CIM Clearance and Separatee Data to identify any separatees currently housed in the institution. Staff may also cross-check the names of separatees with an alphabetical list of all inmates in the institution.

Program Statement No. 5290.15 at 4; *see also, e.g.*, RFP No 25 (SENTRY)-11 to -14 (providing Plaintiff's CIM Clearance and Separatee Data as of April 30, 2014).

It is undisputed that Ms. Stewart accessed Plaintiff's SENTRY-generated intake screening form and, as discussed above, reviewed Plaintiff's CIM separations to determine that no person listed was located at FDC Houston. Stewart Decl. ¶ 26; *see also* Monitored File, SUMMARY-3. The discussion of § 524.72 above shows that Plaintiff has not established that any of his CIM assignments dictated a particular housing assignment for Plaintiff at FDC Houston, and Plaintiff identifies no specific instruction in Program Statement No. P5290.15 that would alter that conclusion. Further, Plaintiff identifies no specific instruction in the Program Statement that would have, based upon his gang affiliation in SENTRY, deprived Ms. Stewart of discretion in making Plaintiff's housing assignment.

Plaintiff suggests that Ms. Stewart violated specific instructions in Program Statement No. P5290.15 by not reviewing Plaintiff's Presentence Investigation Report and Central File. *See* Pl.'s Jurisd. Resp. at 6-7; *see also* Stewart Decl. 8-10. Such a review is only required if the documents are available. *See* Program Statement No. P5290.15 at 3. Plaintiff asserts, in an unsworn brief and without offering a basis for his

knowledge, that those documents are available in SENTRY, to which Ms. Stewart had access. *See* Pl.'s Jurisd. Resp. at 7. Ms. Stewart states that she "do[es] not recall all of the details" of her encounter with Plaintiff on April 16, 2009. Stewart Decl. ¶ 6. However, based on her over twenty-four years of experience with the BOP, Ms. Stewart states that it is likely that she did not review those documents because they were not available. *Id.* ¶¶ 3, 10. She explains that holdover inmates such as Plaintiff "typically do[] not arrive at FDC Houston" with copies of those documents because the documents are at or en route to the inmate's "ultimate confinement facility." *Id.* ¶¶ 7-10.

Regardless of the reason that Ms. Stewart did not review the documents, Plaintiff identifies no manner in which the information contained in those documents would have limited or eliminated Ms. Stewart's discretion under Program Statement No. P5290.15 in making Plaintiff's housing assignment. *See* Pl.'s Jurisd. Resp. at 6-7. The Program Statement itself provides ample discretion, stating that the interviewer shall, after reviewing SENTRY and either of the above noted documents "if available," "make a decision whether the inmate is suitable for placement in general population" and, when the inmate's documentation indicates sexually aggressive behavior or recent sexual trauma, "immediately forward a copy of the Intake Screening Form and any other comments to Psychology Services for appropriate follow-up and or assessment." *See* Program Statement No. P5290.15 at 3. Thus, to the extent that there is a genuine factual dispute here, the fact is not material to the Court's jurisdictional analysis.

Citing *Rivera v. United States*, No. 3:12-CV-1339, 2013 WL 5491740, at *9 (M.D. Pa. Aug. 12, 2013), a Report and Recommendation that was adopted in part and

rejected in part, Plaintiff asserts that the BOP keeps the Texas Syndicate gang completely separate from the Sureños gang. Pl.'s 2nd Suppl. Br. at 2, 5; *see also* Pl.'s 2nd Supp. Br. Ex. 1, Doc. No. 326-1. The referenced statement in *Rivera* is based upon the February 27, 2013 declaration of a BOP Special Investigative Agent at the United States Penitentiary in Lewisburg, Pennsylvania: "The only groups that the BOP keeps completely apart from each other are: Mexican Mafia/Surenos from Texas Syndicate [a]nd Bario Azteca from the Border Brothers." *See* United States' Supplemental Exhibit 9, Declaration of James Fosnot ¶¶ 1, 9, *Rivera v. United States*, No. 3:12-CV-1339 (M.D. Pa. Mar. 8, 2013), Doc. No. 43-3 at 3-5; *Rivera*, 2013 WL 5491740, at *9, *adopted in part and rejected in part*, 2013 WL 5492483 (M.D. Pa. Oct. 2, 2013).[12] This declaration from 2013 offers no indication of when any separation policy took effect or, particularly, whether such a policy was in effect on April 16, 2009.

As further evidence of an applicable BOP-wide separation policy, Plaintiff presents an undated declaration from another federal inmate, Balcazar Ruben, who has been "tagged" by the BOP "with an affiliation with the Barrio Azteca since at least 3/9/1995." Pl.'s 2nd Suppl. Br. Ex. 7 ("Ruben Decl."), Doc. No. 326-7, ¶ 3. Mr. Ruben further asserts, "Wherever we go members of the Texas Syndicate or Aztecs are

---

[12] The Mexican Mafia and Texas Syndicate gangs have both been designated by the BOP as disruptive groups, but there is no indication that the Sureños gang has been so designated. *See* Declaration of James Fosnot ¶ 6, *Rivera v. United States*, No. 3:12-CV-1339 (M.D. Pa. Mar. 8, 2013) (listing the five BOP-designated disruptive groups); Fauver Decl. ¶ 13 (same). Further, despite the slash in "Mexican Mafia/Surenos" in the above quoted declaration, the two gangs appear to be distinct groups. *See, e.g.*, Nat'l Gang Intelligence Ctr., 2013 National Gang Report 9, 14, 32-33 (2013), https://www.fbi.gov/stats-services/publications/national-gang-report-2013.

segregated from Paisa and Sureno gangs, even if we are a member, associated, or just suspects." *Id.* ¶ 7. However, Mr. Ruben fails to specify when this alleged BOP-wide policy went into effect and suggests that there may be "no system wide policy that demands separations" but instead "a local policy or memorandum in each facility." *See id.* ¶¶ 5-8, 10.

Finally, Plaintiff also supports his policy assertion with declarations from four other federal inmates who state that the BOP has designated them as Texas Syndicate gang affiliates and who were all incarcerated at a federal correctional center in Forrest City, Arkansas, at the time of their statements. Pl.'s Obj. to Summ. J. Exs. 1-4, Doc. Nos. 277-1 to 277-4, ¶¶ 3, 7.[13] Each inmate states that "as a result of [the Texas Syndicate gang] affiliation I have separation from Paisa and Sureno gangs." Pl.'s Obj. to Summ. J. Exs. 1-4 ¶ 4 (capitalization altered). Each inmate also states: "Wherever I go, or any person wi[th] an affiliation with the Texas Syndicate, or a prisoner that was assaulted by Paisa or Sureno gangs, if Paisa and/or Surenos are in the yard we have to go to the SHU." Pl.'s Obj. to Summ. J. Exs. 1-4 ¶ 10 (capitalization altered). Although each inmate specifies the date of his alleged designation by the BOP as a Texas Syndicate affiliate, no inmate specifies when the alleged BOP-wide separation policy went into effect. *See* Pl.'s Obj. to Summ. J. Exs. 1-4.

Defendant has generally disavowed the existence of such a policy being in effect on April 16, 2009, particularly at FDC Houston, as discussed in more detail below. *See*

---

[13] For the purposes of this discussion, the declarations are substantively indistinguishable and, thus, cited here collectively.

Fauver Decl. ¶¶ 13-15, 21-24; Gibson Decl. ¶ 17. Defendant's evidence is not entirely unassailable. Yet, even if one were to fully credit the contrary evidence, it does not establish that the alleged BOP-wide policy, requiring the separation of Texas Syndicate affiliates from Sureños affiliates (or from Paisa affiliates), was in effect on the relevant date of April 16, 2009. Having failed to establish the alleged nondiscretionary policy's existence, Plaintiff cannot establish that Ms. Stewart lacked discretion, in the manner suggested by Plaintiff, in making Plaintiff's housing assignment.[14]

### d. FDC Houston Policy

Plaintiff contends that an FDC Houston policy that supplements a BOP policy for intake screening, Institution Supplement No. HOU 5290.13, provides relevant, specific instructions for an FDC Houston staff member to follow when determining an inmate's housing assignment. Citing paragraph (h) of that policy, Plaintiff asserts that Ms. Stewart should have "kept the Plaintiff separated from Paisa and Sureno gang members due to security concerns, including the threat assessment, and placed him in floor 6 West, the only floor segregated from Paisa and Sureno gangs." Pl.'s 2nd Suppl. Br. at 5. The policy itself, however, is not so specific—directing that holdover male inmates (such as

_____

[14] In his second supplemental brief, Plaintiff asserts that *Ashford v. United States*, 511 F.3d 501 (5th Cir. 2007), provides "more than enough evidence" that Plaintiff's alleged reporting to Ms. Stewart and the SIS Officer "about not being safe if they place him with the Paisa and Sureno gangs" implicated a policy that "constrained the officers['] discretion." Pl.'s 2nd Suppl. Br. at 4. In *Ashford*, the policy in question was specific to the United States Penitentiary in Beaumont, Texas, i.e., it was not a BOP-wide policy, and thus is not relevant to Plaintiff's claim here regarding FDC Houston for which Plaintiff has established no similar policy. *See Ashford*, 511 F.3d at 503, 505 (discussing without naming "high-security prison" involved); *Ashford v. United States*, 463 F. App'x 387, 389-90 (5th Cir. 2012) (identifying this facility as USP Beaumont).

Plaintiff was on April 16, 2009) "will be assigned to any of the following Housing Units: 4 East, 4 West, 5 East, 6 East and 6 West." Pl.'s 2nd Suppl. Br. Ex. AA, HOU 5290.13, Doc. No. 326-2, at 3. The policy also states: "In each case, there may be security concerns which may preclude placement in a specific unit. Staff shall use good judgement when these situations occur." *Id.* (Plaintiff's emphasis omitted).

It is undisputed that Plaintiff was assigned to Unit 5 East, *see* Stewart Decl. ¶ 26 and 12/29/2014 Martinez Decl. ¶ 9, a unit designated by the above FDC Houston policy for the assignment of male holdover inmates. Other than specifically limiting Plaintiff's assignment to any of the five male holdover units, no specific instruction may be derived from the above quoted policy that would have dictated or specifically restricted Ms. Stewart's decision in making Plaintiff's housing assignment. The policy's language does not prescribe the course of action that Plaintiff asserts was required, i.e., assignment of Plaintiff to Unit 6 West only. The policy itself refers to a staff member's use of judgment in considering security concerns before assigning an inmate to a particular unit, reflecting that the conduct "involves an element of judgment or choice." *See Berkovitz*, 486 U.S. at 536. Plaintiff has not shown that the specific instructions in the local facility policy precluded Ms. Stewart from assigning Plaintiff to Unit 5 East, which contained Paisa and Sureños gang members, or required Plaintiff's assignment to Unit 6 West.

Plaintiff also points to indirect evidence of an undisclosed or unwritten policy at FDC Houston that requires the assignment of Texas Syndicate gang affiliates to Unit 6 West. For instance, Plaintiff cites his own subsequent experiences at FDC Houston, including a few days after the April 2009 assault, when, upon identifying himself as a

Texas Syndicate gang affiliate, he was either assigned to the segregated housing unit or to Unit 6 West. *See* 12/29/2014 Martinez Decl. ¶¶ 13-14. The three relevant intake screening forms largely do not specify the reason for those assignments. Monitored File, RFP No 25 (SENTRY)-25, -20, -23. From such sparse information, one cannot reasonably infer that Plaintiff's assignments reflect the specific unwritten policy asserted by Plaintiff to have been in effect at the relevant time. Other considerations, including the April 16, 2009 assault itself and consequential judgments about persons from whom Plaintiff should be separated, reasonably could have factored into those later housing decisions.

Plaintiff also supports his assertion of an informal policy through an undated declaration filed in this Court in December 2014, in which he states: "On April 16, 2009 floor 6 West was the only floor that the Texas Syndicate suspect, affiliate, or members were assigned to live in. The Texas Syndicate members, affiliate, or suspects, were not assigned to any other floor on April 16, 2009 at FDC Houston." 12/29/2014 Martinez Decl. ¶¶ 11-12 (numbering omitted); *see also* 8/8/2014 Martinez Decl. ¶ 13 (asserting that "paisa and sureno gangs were segregated from Texas syndicate gang or associate back on April 16,[]2009").[15] As at least a partial basis for his personal knowledge of such specific security practices, Plaintiff newly asserts that during his social interview

---

[15] Of the 115 inmates in Unit 5 East on April 16, 2009, Plaintiff was the only inmate with a Texas Syndicate gang affiliation in the BOP's records. Monitored File, SUMMARY-1. Although this information offers some support for Plaintiff's assertion, the record does not include similar information for any of the other units at FDC Houston and thus does not reveal whether or how many Texas Syndicate gang affiliates were assigned to Unit 6 West or to any other unit on that date.

with Ms. Stewart on April 16, 2009, at FDC Houston: "She assured me that the Texas Syndicate just got a floor in population at FDC Houston." *See* 12/29/2014 Martinez Decl. ¶ 7; *see also id.* ¶ 22 (newly asserting that, "a few days after the assault," a lieutenant at FDC Houston told Plaintiff that Plaintiff "was going to be placed in the right floor this time" and then assigned Plaintiff to Unit 6 West). *Compare* 12/29/2014 Martinez Decl. ¶¶ 7, 22, *with* 8/8/2014 Martinez Decl. ¶¶ 2, 8-10, 13, *and* 9/30/2013 Martinez Decl. ¶ 6, *and* 7/2/2013 Martinez Aff. ¶¶ 4-5, *and* Compl.[16] Plaintiff does not otherwise explain, for instance, how he would know the gang affiliations of inmates in units other than those to which he was assigned.

Plaintiff also presents the declaration of Mr. Ruben, a Barrio Azteca gang affiliate, discussed above:

> If there[']s no system wide policy that demands separations between this gang then there[']s actually a local policy or memorandum in each facility. As an example, every time we passed from Houston FDC, in Houston TX[,] we are placed in floor 6 West. A floor segregated from Paisa and Sureno gangs. Only the Texas families (gangs) are placed in this floor (6West),[]in Houston FDC since at least 2008,[]after a big rioting between this gangs when the BOP tried to house[] us together.

*See* Ruben Decl. ¶¶ 8-9 (numbering omitted). The basis of Mr. Ruben's personal knowledge of these alleged security practices is unclear. *See id.* Further, although Mr. Ruben begins his declaration in the first-person singular (e.g., "I was involved," when

---

[16] In Plaintiff's sworn pleading, filed in 2011, he originally alleged (1) that he was not a member of any gang; (2) that he was assaulted by Paisa and Sureños gang members because he refused to join them; and (3) that the BOP "had a bad history of . . . not (segregating) doing the necessary to disrupt Paisa and Sureño gang assaults." Compl. at 8, 22, 26, 32.

referring to a specific incident), he subsequently uses only plural references ("we" and "us") in his statements, making the extent to which Mr. Ruben bases these statements on personal knowledge and experience unclear. *See id.* ¶¶ 4, 7-10.

Defendant, through the declaration of Captain Fauver, has largely denied Plaintiff's assertion that a specific policy exists regarding housing assignments at FDC Houston for Texas Syndicate gang affiliates.

> From April 16, 2009, to present, FDC Houston has not adopted an Institutional Supplement, Operations Memorandum, or other policy adopting special instructions for the placement of Texas Syndicate affiliates at FDC Houston. Placement decisions about Texas Syndicate affiliates are made on a case-by-case basis, in the discretion of the FDC Houston staff.

Fauver Decl. ¶ 22; *see also id.* ¶ 24 ("FDC Houston has not adopted a blanket policy directing assignment of TS Associates, TS Suspects, or TS Members to its Special Housing Unit. Assignment decisions are made on a case-by-case basis, in the discretion

of FDC Houston staff members.").[17]   Captain Fauver acknowledges that "[i]n March 2008 there was a large-scale fight among Mexican inmates at FDC Houston's general inmate population," but he asserts that "[e]ven after that fight, Texas Syndicate affiliates continued to be placed in FDC Houston's general inmate population." *Id.* ¶ 23.

As the basis for his knowledge of FDC Houston's relevant security practices, Captain Fauver states that he has been FDC Houston's Supervisory Correctional Officer since June 2006 and has been employed with the BOP since June 1989. *Id.* ¶ 1. Among other things, Captain Fauver "serve[s] as the resident expert on all custodial and security

---

[17] Two statements in Ms. Stewart's Declaration also appear policy-related:

> 18. If Mr. Martinez had indicated during our interview that he was affiliated with the Texas Syndicate, or was wrongly believed to be affiliated with the Texas Syndicate, I would have contacted our Gang Intelligence Unit. If a newly arrived inmate cannot be interviewed immediately by the Gang Intelligence Unit, I have authority to send the inmate to the SHU pending the Gang Intelligence Unit's interview and review of the matter.
>
> 19. To my knowledge, in April 2009 there was no policy in the BOP or at FDC Houston requiring the segregation of Texas Syndicate members and associates from members and associates of the Paisas or Sureños. Sometime after April 2009, members of the Texas Syndicate were routinely assigned to the SHU.

Stewart Decl. ¶¶ 18-19. As to the first statement, Plaintiff was interviewed by an SIS Officer from the Gang Intelligence Unit upon his arrival at FDC Houston *before* his interview with Ms. Stewart. *See* Martinez SIS Interview Decl. ¶¶ 2-6, 10-13; 7/2/2013 Martinez Aff. ¶ 3; Fauver Decl., Doc. No. 304-1, ¶ 10; Pl.'s Jurisd. Resp. at 2. Regardless, Ms. Stewart stated only that she had "authority," not an obligation, "to send the inmate to the SHU," and does not indicate the source of that authority. Captain Fauver clarifies that "there was no FDC Houston policy in April 2009 requiring Correctional Counselor Stewart to refer Plaintiff or any other inmate back to FDC Houston's Gang Intelligence Unit." Fauver Decl. ¶ 11. Even if Ms. Stewart's and Captain Fauver's statements conflict, neither helps Plaintiff to establish the informal policy that he alleges to have existed on April 16, 2009—that FDC Houston staff members were required to assign Texas Syndicate affiliates exclusively to Unit 6 West.

questions arising at FDC Houston" and is "familiar with BOP policies and the policies and practices of FDC Houston regarding the classification and assignment of inmates." *Id.* ¶¶ 2-3.

In sum, Plaintiff's only evidence that is specific enough to indicate that FDC Houston had a policy in effect on April 16, 2009, that required staff members to assign Texas Syndicate gang affiliates exclusively to Unit 6 West, is Plaintiff's own statements, accompanied by his new assertion that Ms. Stewart "assured" him on April 16, 2009, "that the Texas Syndicate just got a floor in population at FDC Houston." *See* 12/29/2014 Martinez Decl. ¶ 7. Ms. Stewart's sworn statements on the matter reflect no such policy, and Defendant Fauver's statements effectively deny the existence of such a policy. *See* Stewart Decl. ¶¶ 18-19; Fauver Decl. ¶¶ 22-24.

Further, despite lengthy discovery having been permitted and undertaken in this lawsuit, no objective evidence of this alleged policy's existence has been submitted to the Court as part of the summary judgment record.[18] The only FDC Houston policy filed for

---

[18] In an unsworn brief, Plaintiff asserts:

> The Court may want to consider that there was actually a threat assessment at FDC Houston on April 16, 2009 that instruct[s] staff members to separate the TS from Paisa and Sureno and Tango Blast gangs[.] Even when the Defendant is not producing the document,[]requested in several occasions by Plaintiff, he has yet to deny existence of such document, which creates a genuine issue that cannot be decided on Summary Judgment.

Pl.'s 2nd Suppl. Br. at 5-6. Plaintiff offers no additional details and no explanation for his personal knowledge as to this alleged threat assessment. *See id.* Plaintiff has not reurged this discovery argument since the Court last ruled upon Plaintiff's discovery-related motions. Moreover, regardless of any discovery dispute, Defendant has

the Court's consideration, a document filed by Plaintiff, is FDC Houston's local policy regarding housing unit assignments upon intake, discussed above, which generally accords broad discretion to staff members in making housing assignments. In light of this evidence and the lack of objective, supportive evidence for the policy alleged by Plaintiff, one cannot reasonably infer from the summary judgment record that on April 16, 2009, a policy existed that directed FDC Houston staff members to assign all Texas Syndicate affiliates to Unit 6 West.

Plaintiff has not established the existence of a material disputed fact on the issue of whether the alleged policy exists. *Cf. Scott*, 550 U.S. at 380; *Lambert v. United States*, 198 F. App'x 835, 838-39 (11th Cir. 2006) (per curiam) (affirming finding that discretionary function exception applied to security classification decision where plaintiff "offer[ed] nothing more than his own statements" to support existence of allegedly violated policy). Having failed to establish a genuine dispute of fact as to the alleged policy's existence, Plaintiff cannot establish that Ms. Stewart lacked discretion, in the manner suggested by Plaintiff, in making Plaintiff's housing assignment.

e.   Summary

Plaintiff has not established that a federal statute, regulation, or policy deprived Ms. Stewart of her discretion when assigning Plaintiff to Unit 5 East at FDC Houston on

---

effectively denied, through Captain Fauver's declaration quoted above, the existence of any document containing the instructions alleged by Plaintiff. Plaintiff's unsupported assertion of a dispute is insufficient alone to establish the existence of a disputed material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

April 16, 2009. Because Ms. Stewart had discretion in the challenged conduct, Plaintiff has failed to establish the absence of the discretionary function exception's first element. *See Berkovitz*, 486 U.S. at 536; *Kiehn*, 984 F.2d at 1102.

3. *Berkovitz* Analysis: Prong Two

Having determined that the first element of the discretionary function exception is present, the undersigned must also consider the second element: whether Ms. Stewart's exercise of judgment or choice in making Plaintiff's housing assignment required public policy considerations. *See Garcia*, 533 F.3d at 1176. Courts have consistently concluded that discretionary inmate classification decisions require public policy considerations. *E.g.*, *Santana-Rosa v. United States*, 335 F.3d 39, 44-45 (1st Cir. 2003) ("Decisions with regard to classification of prisoners, assignment to particular institutions or units, and allocation of guards and other correctional staff must be viewed as falling within the discretionary function exception to the FTCA, if penal institutions are to have the flexibility to operate."); *Ashford v. United States*, 463 F. App'x 387, 394-95 (5th Cir. 2012); *Calderon*, 123 F.3d at 950-51; *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795-96 (8th Cir. 1998); *Cohen*, 151 F.3d at 1344 ("Deciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons." (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979))); *Brown*, 569 F. Supp. 2d at 600-01; *Usry v. United States*, No. 5:11CV141, 2013 WL 1196650, at \*7-8 (N.D.W. Va. Mar. 25, 2013); *cf. Miller v. United States*, No. 93-3021, 1993 WL 137103, at \*1 (10th Cir. Apr. 23, 1993) ("A prison's internal security is normally left to the discretion of

prison officials, and in this case the actions of the officials in responding to the disturbance were clearly discretionary." (citation omitted)). In her declaration, Ms. Stewart also describes various policy-related considerations in making housing assignments. *See* Stewart Decl. ¶¶ 27-37.

Further, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *See Gaubert*, 499 U.S. at 324. Under the statute, regulations, and policies discussed above, Ms. Stewart was permitted to exercise discretion. Thus, the Court must presume that her act of determining Plaintiff's housing assignment was grounded in public policy. *See id.* Plaintiff's arguments, detailed above, focus on whether Ms. Stewart had discretion and do not address whether Ms. Stewart's exercise of discretion in making Plaintiff's housing assignment was grounded in public policy, *see* Pl.'s Jurisd. Resp.; Pl.'s Suppl. Resp.; Pl.'s 2nd Suppl. Br., and offer nothing to overcome the noted presumption. Because Ms. Stewart's decision was "one requiring the exercise of judgment based on considerations of public policy," *Garcia*, 533 F.3d at 1176, the undersigned finds that the second element of the discretionary function exception is present.

4. Conclusion

Considering the record evidence and inferences drawn therefrom in the light most favorable to Plaintiff, the undisputed material facts establish that both elements of the FTCA's discretionary function exception are present. *See supra* Parts A-C.3. Thus, the

exception applies, and the Court lacks subject-matter jurisdiction over Plaintiff's only remaining legal claim against Defendant. *See supra* Part B.

## RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Court grant summary judgment to Defendant based upon Defendant's Jurisdiction Motion (Doc. No. 251). *See, e.g.*, *Garcia*, 533 F.3d at 1175-76, 1178; *Redmon*, 934 F.2d at 1155; *Wheeler*, 825 F.2d at 259. The undersigned further recommends that the Court deny all other pending motions (Doc. Nos. 233, 253, 330, 350) as moot.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of the right to file an objection to this Report and Recommendation with the Clerk of this Court by October 7, 2015, in accordance with 28 U.S.C. § 636 and Federal Rule of Civil Procedure 72. The parties are further advised that failure to timely object to this Report and Recommendation waives the right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This Report and Recommendation terminates the referral in the present case.

ENTERED this 16th day of September, 2015.

CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE